**NOT FOR PUBLICATION**  **CLOSED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES MEALS, <br><br> Plaintiff, <br><br> v. <br><br> PORT AUTHORITY TRANS-HUDSON, <br><br> Defendant. | Civil Action No. 12-2628 (JLL) (JAD) <br><br> **OPINION** |

**LINARES**, District Judge.

This matter comes before the Court by way of a motion for a new trial, amended judgment and/or for remittitur pursuant to Federal Rule of Civil Procedure 59 filed by Defendant Port Authority Trans-Hudson ("Port Authority") [Docket Entry No. 47]. The Court has considered the submissions made in support of and in opposition to the instant motion. No oral argument was heard. Fed. R. Civ. P. 78. Based on the reasons that follow, Defendant's motion is **denied in part and granted in part**.

I.  BACKGROUND

This negligence action is brought under the Federal Employers' Liability Act, 45 U.S.C. § 51, et seq. Defendant Port Authority is a bi-state entity and operates a railroad within the District of New Jersey. On February 10, 2011, the defendant employed the plaintiff as a trackman. On February 10, 2011, approximately three hours into his shift, plaintiff was injured while pulling pin

spikes using a claw bar and half washer in Tunnel A3. As a result of this incident, Plaintiff sustained a penetrating injury to his right eye.[1]

This case was tried before a jury in February 2014. On February 24, 2014, the jury returned a verdict in the amount of $3,750,000.00. The parties agreed that the medical expenses expended by Defendant on behalf of Plaintiff, in the amount of $38,308.39, would be added to the verdict. As such, on March 25, 2014, Judgment was entered in the total amount of $3,788,308.39.

Defendant Port Authority now moves for a new trial, amended judgment and/or for remittitur pursuant to Federal Rule of Civil Procedure 59.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 59(a)(1)(A) authorizes the Court to "grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."

In determining a motion for new trial based on improper conduct by opposing counsel, the "test is whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207 (3d Cir. 1992) (quoting *Draper v. Airco, Inc.*, 580 F.2d 91, 97 (3d Cir. 1978).[2] "[T]he amount

---

[1] *See* Trial Tr. 2.17:7-17.

[2] *See, e.g., Draper*, 580 F.2d at 95 (concluding that the district court erred in its refusal to grant a new trial where plaintiff's counsel "attempted to prejudice the jurors through repeated inappropriate references to the defendants' wealth; . . . asserted his personal opinion of the justness of his client's cause; . . . prejudicially referred to facts not in evidence; and, . . . without provocation or basis in fact, . . . made several prejudicial, vituperative and insulting references to opposing counsel."); *Fineman*, 980 F.2d at 208-10 (upholding decision to grant a new trial where plaintiff's counsel "improperly provided his personal opinion as to the justness of his cause;" referred to extrinsic evidence; made vituperative references to opposing counsel; and used inappropriately impassioned speech to discredit witnesses).

2

of alleged improprieties matters for determining whether it is reasonably probable that counsel's arguments are prejudicial." *Vandenbraak v. Alfieri*, 209 F. App'x 185, 189 (3d Cir. 2006).

When reviewing a motion on grounds of trial error, "the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. Therefore, "[t]he court's inquiry in evaluating a motion for a new trial on the basis of trial error is twofold." *Farra v. Stanley–Bostitch, Inc.*, 838 F. Supp. 1021, 1026 (E.D. Pa. Dec. 6, 1993), *aff'd without op.*, 31 F.3d 1171 (3d Cir. 1994). "It must first determine whether an error was made in the course of the trial, and then must determine 'whether that error was so prejudicial that refusal to grant a new trial would be 'inconsistent with substantial justice.' " *Id.* (internal citations omitted).

A motion for a new trial on grounds of insufficiency of evidence, on the other hand, "should be granted when, in the opinion of the trial court, the verdict is contrary to the great weight of the evidence, thus making a new trial necessary to prevent a miscarriage of justice." *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735-36 (3d Cir. 1988); *see also Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993) ("[T]he district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand."); *see, e.g., In re. Bayside Hosp. Prison Litig.*, 331 F. App'x 987, 992 (3d Cir. 2009) (affirming denial of new trial where witness testimony and photographic evidence "substantiated Plaintiff's claimed injuries"); *Radwan v. Carteret Bd. of Educ.*, 62 F. App'x 34, 38 (3d Cir. 2003) (reversing the district court's grant of a new trial because a new trial was not necessary to "avert an injustice"). In reviewing such a motion, the Court must view all the evidence and inferences reasonably drawn from the evidence in the light most favorable to the party with the verdict. *See Hofkin v. Provident Life & Acc. Ins. Co.*, 81 F.3d 365, 369 (3d Cir. 1996).

Finally, if the district court "believes the amount of the verdict is not supported by the evidence,"[3] or otherwise shocks the judicial conscience,[4] it has the discretionary power to reduce a jury's award of damages through conditional remittitur. A conditional remittitur affords the movant "the opportunity to choose between the remitted award and a new trial on damages." *Lesende v. Borrero*, 2014 WL 1924726, at *12 (3d Cir. May 15, 2014); *see generally Hetzel v. Prince William Cnty.*, 523 U.S. 208, 211 (1998) (per curiam) (explaining that when a trial court determines that the evidence does not support the jury's general damages award, it "has no authority . . . to enter an absolute judgment for any other sum than that assessed by the jury" without allowing plaintiff the option of a new trial). In determining whether the amount of the verdict is not supported by the evidence or whether it otherwise shocks the judicial conscience, courts consider whether the "jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995). In other words, the court should consider whether there is a "rational relationship between the specific injury sustained and the amount awarded." *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir. 1987); *see, e.g., Glass v. Snellbaker*, 2008 WL 4371760, at *6 (D.N.J. Sept. 17, 2008) ("Verdicts that shock the judicial conscience are those that bear no rational relationship to the evidence presented.").

---

[3] *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 715-18 (3d Cir. 2010).

[4] *See Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991) ("[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.").

## III. DISCUSSION

Defendant urges the Court to grant a new trial on the following grounds: (1) Plaintiff's counsel breached the rules of proper argument and in doing so prejudiced the jury's findings with respect to liability and damages; and (2) Plaintiff's treating physician testified beyond the scope of his treatment of Plaintiff and was improperly permitted to testify on matters reserved for expert witnesses. In the alternative, Defendant urges the Court to amend the Judgment for four reasons: (1) the jury award was excessive and should be subject to remittitur; (2) the jury verdict was excessive based on the clear evidence of Plaintiff's failure to mitigate his damages and the Court's refusal to clarify this issue to the jury when asked to do so; (3) the Court's refusal to allow Defendant to present evidence of sickness benefits and medical expenses paid by Defendant prejudiced the jury's findings with respect to liability and damages; and (4) Plaintiff is not entitled to a windfall from the medical and sickness benefits that were paid to Plaintiff by Defendant.

### A. Motion for New Trial

As stated above, Defendant urges the Court to grant a new trial on the following two grounds: (1) Plaintiff's counsel breached the rules of proper argument and in doing so prejudiced the jury's findings with respect to liability and damages; and (2) Plaintiff's treating physician testified beyond the scope of his treatment of Plaintiff and was improperly permitted to testify on matters reserved for expert witnesses.

As to Defendant's argument concerning the alleged improper conduct by Plaintiff's counsel's, the "test is whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Fineman*, 980 F.2d at 207. "[T]he amount of alleged improprieties matters for determining whether it is reasonably probable that counsel's

5

arguments are prejudicial." *Vandenbraak*, 209 F. App'x at 189. Here, Defendant argues that Plaintiff's counsel's "repeated references to Defendant's alleged wealth, the 'shame on Mr. Brody' comment, the statement that counsel's arguments were 'disingenuous,' the 'parlor trick' comment, and the 'great lawyer's trick' comment make it reasonably probable that the jury's excessive verdict was influenced by these improper remarks." (Def. Br. at 7-8). Having carefully considered the various remarks upon which Defendant relies, the Court does not conclude that such remarks were improper when viewed in their proper context, nor does the Court conclude that such remarks made it reasonable probable that the verdict in this case was influenced by prejudicial statements. In particular, the Court finds as follows.

First, there is no indication in the record that Defense counsel objected to the foregoing remarks by Plaintiff's counsel during the course of the trial.

Second, the Court does not conclude that Plaintiff's counsel made any improper references to Defendant's wealth during his opening statement. To the contrary, Plaintiff's counsel's remark concerning the existence of the spike puller machine, which served as an alternative—albeit slower—way of pulling spikes, was made to support the claim that Defendant chose efficiency over safety. *See* Trial Tr. at 72:2-73:1 ("It is faster to pop them out like that, use brute force, absolutely, and faster translates into more efficient, and more efficient translates into less overtime, and less overtime translates into we don't have to pay him as much, and we can get more done quicker . . . ."). This remark by Plaintiff's counsel during his opening statement was later supported by the testimony of Plaintiff's immediate supervisor, Alberto Gonzales, who testified that:

> Q: Now, there is nothing that prevents you from using the machine. It is just a determination of efficiency, correct?
>
> A: Yes.

6

(Trial Tr. at 154:8-24).

Third, the Court finds that Plaintiff's counsel did not make any prejudicial, insulting or otherwise improper references to Defense counsel. Defendant relies on the following remarks in support of this aspect of his motion:

- "[I]n his closing, Plaintiff's counsel, in response to Defendant's closing in which he stated that there was no evidence as to what struck Plaintiff's eye, stated 'Shame on Mr. Brophy for trying to make that kind of an argument.' *See id.* at 151:15-24. Defendant's counsel objection was overruled. *See id.* Thereafter, Defendant's counsel did not object to the further statements made by Plaintiff's counsel in his closing." (Def. Br. at 6).

- "Later in his closing, Plaintiff's counsel, in response to Defendant's closing in which he stated that there was no evidence as to where the glasses were on Plaintiff's face when he was struck in eye, stated 'So to say that somehow we don't know where the glasses were is just disingenuous.' *See id.* at 152:17-19." (Def. Br. at 6).

- "In response to Defendant's counsel directing Plaintiff to put his safety glasses on so that the Court and jury could see how they looked on his face, Plaintiff's counsel, in his closing, called it a 'parlor trick' that 'was very O.J. like, the glove didn't fit right.' *See id.* at 156:1-4." (Def. Br. at 6).

- "Finally, in his closing, in commenting on Defendant's counsel's cross examination of Plaintiff with statements made in his medical records, Plaintiff's counsel called Defendant's counsel's conduct in this regard 'a great lawyer's [trick], slide it in, slide it out, slide it in, slide it out.' *See id.* at 164:7-10. During the cross examination of Plaintiff with the statements he made which were contained within medical records, Plaintiff's counsel did not object." (Def. Br. at 6-7).

7

Having carefully considered each of the alleged instances of impropriety—in their respective contexts—the Court does not conclude that any such comments—either in isolation or when viewed as a whole—were vituperative or even insulting. Nor does the Court find that any of the alleged instances of impropriety made it reasonably probable that the verdict was influenced by prejudicial statements. *See Fineman*, 980 F.2d at 207. To the contrary, Defense counsel concedes that each of the statements at issue by Plaintiff's counsel were made in response to statements or questions by Defense counsel. *See generally Draper*, 580 F.2d at 95 ("[W]e do not expect advocacy to be devoid of passion. A life has been lost here and the family is entitled to have someone speak with eloquence and compassion for their cause."). Moreover, the jury was subjected to extensive testimony over the course of the trial regarding the circumstances surrounding Plaintiff's injury and thus was fully capable of assessing the accuracy of Plaintiff's counsel's statements. Finally, the Court reiterates that Defense counsel never raised an objection as to *any* of the alleged instances of improprieties during the trial—at which point in time the Court *could* have given a curative instruction before the jury reached its verdict. *See Vandenbraak*, 209 F. App'x at 190 ("When there is a misstatement in closing argument and it is brought to the attention of the trial judge, jury instructions can 'sufficiently negate[ ] any prejudice that might ... result[ ] from ... counsel's errant arguments to the jury.' ") (quoting *Edwards v. City of Phila.*, 860 F.2d 568, 575 (3d Cir.1988)). A new trial is therefore not warranted on this basis.

As to Defendant's argument that Plaintiff's treating physician testified beyond the scope of his treatment of Plaintiff and was improperly permitted to testify on matters reserved for expert witnesses, the Court must first determine whether it erred in allowing the pertinent testimony by Plaintiff's treating physician and, if so, assess whether such error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice. *See Farra*, 838 F. Supp. at 1026,

8

*aff'd without op.*, 31 F.3d 1171 (3d Cir.1994). In support of this aspect of its motion, Defendant argues: (1) Plaintiff's treating physician, Dr. Walsman, was not disclosed as an expert, but rather as a treating physician; (2) as of the time of trial and according to Dr. Walsman's treating notes and testimony, Plaintiff was neither treated by nor diagnosed by Dr. Walsman as having glaucoma; rather, Dr. Walsman testified that Plaintiff had a possible increased risk of developing glaucoma in the future; and (3) such speculative opinion testimony by Dr. Walsman should have been prohibited in the absence of a formal expert disclosure under Federal Rule of Civil Procedure 26(a)(2)(B). (Def. Br. at 10-11). Defendant also maintains that it would have filed a motion in limine to bar Dr. Walsman's testimony as to potential future complications but had no advance notice that Dr. Walsman would testify to this. (Def. Br. at 11 n. 1).

Over Defendant's objection, the Court allowed Dr. Walsman to testify as to Plaintiff's increased risk of glaucoma. In particular, Dr. Walsman testified that "penetrating injuries of trauma injuries to the eye can, not necessarily, but can increase a patient's risk to glaucoma in the future." *See* Trial Tr. at 2.49:5-7. Dr. Walsman further testified that the range of trauma patients getting glaucoma "is somewhere between 17 and 49 percent." *See id.* at 49:8-16. Because Dr. Walsman testified that there was less than a 50% chance of Plaintiff getting glaucoma in the future, Defendant maintains that such prejudicial testimony by Dr. Walsman should not have been permitted by the Court, thus warranting a new trial.

As a preliminary matter, the Court notes that Defendant did not file a motion in limine seeking to preclude Dr. Walsman from testifying as to Plaintiff's future risk of glaucoma due to Plaintiff's purported failure to comply with Federal Rule of Civil Procedure 26(a)(2). To the extent Defendant maintains that it received no prior notice concerning Dr. Walsman's anticipated testimony concerning Plaintiff's future risk of glaucoma, Plaintiff's counsel represents that

9

Defendant chose not to depose Dr. Walsman while discovery was open. Defendant does not dispute this.

Moreover, although Defendant correctly points out that "Rule 26 delineates additional safeguards with respect to expert testimony," Plaintiff regarded Dr. Walsman as a fact witness, not an expert witness. *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 112-13 (1st Cir. 2003). Accordingly, this Court allowed Dr. Walsman to testify as to Plaintiff's future risk of glaucoma *only* to the extent that it related to Plaintiff's diagnosis and ongoing treatment. *See generally id.* at 113 ("By and large, courts have followed the advisory committee's lead and ruled that a treating physician, testifying as to his consultation with or treatment of a patient, is not an expert witness for purposes of Rule 26."). Although Plaintiff was neither treated by nor diagnosed by Dr. Walsman as having glaucoma, his testimony concerning (and quantification of) Plaintiff's risk of developing glaucoma—as a side effect of his ruptured globe—was admissible to explain the need for Plaintiff to undergo ongoing medical monitoring 2-3 times per year. *See* Trial Tr. 2.50:4-2.51:6. For example, Dr. Walsman testified that:

> We talked about that [Plaintiff] James will always need to be seen on a fairly regular schedule by an ophthalmologist. . . . To be able to pick up future consequences of trauma, such as glaucoma. . . .
>
> Although there is no pain, the nerve tissue or the nerve structure itself can begin to deteriorate and that deterioration is unfortunately permanent in glaucoma cases, because the optic nerve . . . does not regenerate, so it is much like a spinal cord injury. Once the nerve tissue is damaged or gone, it cannot be returned, so the true treatment and care of glaucoma patients is proper maintenance and follow-up for them to try to stop it before it occurs.

(*Id.*). In light of this testimony, the Court concludes, once again, that Dr. Walsman's testimony about the circumstances surrounding Plaintiff's need for ongoing medical monitoring was properly admissible under Rule 701 and thus does not warrant a new trial in this matter. *See, e.g., Rodriguez*

10

*v. Town of West New York*, 191 F. App'x 166, 169 (3d Cir. 2006) ("Nor did the district court err in concluding that the testimony offered by the two physicians fell outside the scope of Rule 701" where "doctor seen almost two years after the traffic stop and several months before filing the complaint was retained in anticipation of litigation and was therefore required to file an expert report" and where "the other physician was not a direct participant in the events at issue nor was he going to testify about his consultation and treatment of Rodriguez.").

### B. Motion to Amend Judgment

As stated above, in the alternative, Defendant urges the Court to amend the Judgment for four reasons: (1) the jury award was excessive and should be subject to remittitur; (2) the jury verdict was excessive based on the clear evidence of Plaintiff's failure to mitigate his damages and the Court's refusal to clarify this issue to the jury when asked to do so; (3) the Court's refusal to allow Defendant to present evidence of sickness benefits and medical expenses paid by Defendant prejudiced the jury's findings with respect to liability and damages; and (4) Plaintiff is not entitled to a windfall from the medical and sickness benefits that were paid to Plaintiff by Defendant.

As stated above, in determining whether the amount of the verdict is not supported by the evidence or whether it otherwise shocks the judicial conscience, courts consider whether the "jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole." *Starceski*, 54 F.3d at 1100. In other words, the court should consider whether there is a rational relationship between the specific injury sustained and the amount awarded." *Gumbs*, 823 F.2d at 773; *see, e.g., Glass*, 2008 WL 4371760, at *6 (D.N.J. Sept. 17, 2008) ("Verdicts that shock the judicial conscience are those that bear no rational relationship to the evidence presented."). In support of its claim that the "damage award in this case was a result of

passion or prejudice by the jury as evidenced by its excessive nature," Defendant points the Court to various cases involving similar injuries in which the jury verdicts were much lower than the award in this matter. *See* Def. Br. at 16-17. In response, Plaintiff has come forward with its own list of comparable cases, with much higher (inflation adjusted) verdicts. *See* Pl. Br. at 10.

"While a district court has discretion in determining whether a jury's verdict is excessive, it is undisputed that the court may not vacate or reduce the award merely because it would have granted a lesser amount of damages. For the court to disturb a jury verdict, 'the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court.' " *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989).

Having carefully considered the parties' arguments, and the cases cited to by both sides, the Court does not conclude that the damage award in this case is clearly unsupported by the evidence, exceeds the amount needed to make the Plaintiff whole and/or shocks the judicial conscience. *See generally Starceski*, 54 F.3d at 1100. As Plaintiff points out in his opposition, the jury in this case heard—and saw—days of testimony and evidence of what it was like to watch a needle come at Plaintiff's eyeball. They heard and saw how the various surgeries were performed on Plaintiff's eye. For example, the jury heard how a metal speculum was placed inside Plaintiff's eye to hold his eyelid open. *See* Trial Tr. 2.34:15-2.35:14. They also learned that Plaintiff was wide awake—and could see—when a 30-gauge needle entered his eyeball and penetrated all the way through his sclera. *Id.* at 2.34-2.36:19. They learned that Plaintiff was so "freaked out" during these procedures that he had to be physically strapped down with what felt like handcuffs. *Id.* at 2.126: 8-13. They learned how his pain medication wore off halfway through at least one of his medical procedures. *Id.* at 2.126:16-21.

It was well within the jury's province as the finders of fact to, *inter alia*, weigh and evaluate the evidence, consider the totality of the circumstances—such as Plaintiff's age, 30—credit or discredit Plaintiff's testimony concerning his pain and suffering, or reject—in whole or in part—any evidence generally found to be unconvincing. And the jury presumably went through this exhaustive effort when it ultimately assessed Plaintiff's damages in the amount of $3,750,000.00. This Court will not disturb the jury's permissible conclusion. *See, e.g., Majmundar v. J.P. Stevens High School, et al.*, 2012 WL 7811182 (N.J. Super. Ct. Law Div. Aug. 1, 2012) (settling for $1,400,000 where 75-year old "plaintiff, who had a long-standing vision loss in one eye related to macular degeneration, suffered a rupture of the other globe in the fall [off auditorium stage] and has been left virtually blind."); *Rafael Gutierrez v. Buckeye Abrasives Inc., et al.*, 2010 WL 2031605 (N.J. Super. Ct. Law Div. March 10, 2010) (settling for $1,000,000 where 34 year-old truck driver plaintiff attempted to use compressor-driven grinder to buff the rubber of the tire he was repairing (on a truck he was about to operate) and an abrasive stone inside the grinder splintered during the process, causing a fragment to fly up under plaintiff's safety glasses and into his left eye, rupturing the globe of the left eye). Defendant's request that the judgment be amended as excessive and/or subject to remittitur is therefore denied.

Next, Defendant argues that the Court erred in failing to read the mitigation charge to the jury when it asked the Court to clarify question number four—which read: "Has the defendant, PATH, proven by a preponderance of the evidence that plaintiff, James Meals, was negligent, yes or no?" Before answering this question, the jury asked the Court for the following clarification: "Does this pertain only to the original incident of on or about February 11, 2011?" *See* Trial Tr. at 4.3:6-15. Defense counsel urged the Court, "for clarification sake," to read the failure to mitigate instruction to the jury. *See id.* at 4.320-22; 4.4:15-18. The Court denied Defendant's request and

simply answered the jury's question with "yes." *See id.* at 4.5:8-11. Defendant has failed to convince the Court that this Court's answer to the jury's request for clarification of question number four was wrong or otherwise led to an inflated jury award. To the contrary, the Court agrees with Plaintiff that Defendant appears to conflate the issues of comparative negligence with mitigation of damages. As explained by Circuit Judge Weis:

> Mitigation and apportionment of damages are different concepts than contributory or comparative negligence. Contributory negligence frees the defendant from liability and all responsibility for damages. Comparative negligence appraises the factors which caused the impact, collision or similar event and uses the relative degree of fault to reduce the damages. Mitigation or apportionment of damages and avoidable consequences, on the other hand, are directed toward activity (or nonaction) having a direct bearing on the extent of injury but not on the conduct causing the litigated event.

*Vizzini v. Ford Motor Co.*, 569 F.2d 754, 769 (3d Cir. 1977) (Weis, J.F., dissenting). Thus, the jury's request for clarification on a question pertaining to Plaintiff's potential negligence—i.e., Plaintiff's conduct, if any, which caused the litigated event—did not implicate or otherwise require a re-reading of the mitigation charge—which pertained to the separate issue of the extent of Plaintiff's injuries flowing from the litigated event. *See id.* Defendant's suggestion that the jury somehow misunderstood the Court's instruction on mitigation of damages[5] and/or that such misunderstanding led to an inflated award of damages is based on pure speculation. To the contrary, it is the Court's view that repeating its mitigation of damages instruction in response to

---

[5] On the issue of mitigation of damages, the Court instructed: "An injured party is under a legal obligation to mitigate his damages. That is, to minimize the economic loss resulting from his injury. If the plaintiff failed to take reasonable steps to assist in effecting a healing of his injury so as to enable him to return to work, or if he doesn't resume available employment even though he's physically able to do so, such person may not recover damages for earnings lost after the date on which he was or reasonably could have been able to return to some form of gainful employment." Trial Tr. 3.11:3-12.

14

the jury's question pertaining to Plaintiff's negligence would likely have resulted in unnecessary confusion of the issues. Defendant's argument in this regard is therefore rejected.

Next, Defendant argues that the Court's refusal to allow Defendant to present evidence of sickness benefits and/or medical expenses paid by Defendant after Plaintiff opened the door to such evidence prejudiced the jury's finding with respect to liability and damages.[6] (Def. Br. at 23). Pursuant to the collateral benefit rule, evidence regarding collateral benefits or conduct relating to their receipt is generally inadmissible in cases arising under the Federal Employers' Liability Act. *Gladden v. P. Henderson & Co.*, 385 F.2d 480, 483 (3d Cir. 1967). After Plaintiff testified that he was "dying to return to work" because, among other things, he "didn't have any money really coming in," Defendant attempted to question Plaintiff on whether "PATH pays you when you are out?" *See* Trial Tr. at 2.171:23:1.172:23. Plaintiff's counsel objected to this line of questioning on the basis of the collateral benefit rule. *See id.* This Court sustained Plaintiff's objection on the basis of the collateral benefit rule. Defendant now takes issue with this evidentiary ruling.

The Court is cognizant that a Plaintiff's affirmative testimony that he returned to work because of his financial need can, under certain circumstances, put his financial status at issue and thus open the door for "cross-examination for the narrow purpose of testing the credibility of plaintiff's assertion." *Gladden*, 385 F.2d at 483. Based on the particular testimony offered by

---

[6] Defendant further argues that this prejudice was inflated by the Court's refusal to admit Exhibit 113—a PATH medical document—in redacted form. (Def. Br. at 27). In particular, Defendant argues that Exhibit 113 included language stating that Plaintiff returned to work because of his financial condition rather than because he was healthy. "Over Defendant's objection, the entire document was admitted into evidence without the ability to challenge plaintiff's credibility on the matter." (*Id.*). To be clear, it was Defendant who sought to admit this document into evidence. Having carefully considered Defendant's argument, the Court does not conclude that it abused its discretion in allowing Defendant to introduce such document in its entirety. In other words, the Court does not conclude that it abused its discretion in refusing to allow Defendant to selectively redact the portion of the document *it* sought to introduce which included language stating that Plaintiff returned to work because of his financial condition.

Plaintiff in this case, and Defendant's line of questioning, the Court nevertheless exercised its discretion in concluding that the prejudicial effect of the evidence sought to be introduced by Defendant substantially outweighed whatever probative value such testimony would have had on the issue of Plaintiff's credibility. *See* Fed. R. Evid. 403. It is well settled that district courts have wide discretion in making evidentiary rulings. *See, e.g., Klein v. Hollings*, 992 F.2d 1285, 1289–90 (3d Cir. 1993) (explaining that when the motion for a new trial involves a matter within the trial court's sound discretion, such as evidentiary rulings, charges to the jury, or prejudicial statements made by counsel, the district court has broad latitude in ruling on the motion). Defendant's arguments do not convince the Court that it abused its discretion in excluding evidence related to monies paid by Defendant to Plaintiff while he was out work as a result of the incident in question pursuant to the collateral benefit rule. Even if the Court *had* committed an error in excluding such evidence, Defendants do not explain—with anything more than pure speculation—*how* any such mistake specifically prejudiced Defendant or otherwise affected Defendant's substantial rights. *See generally* Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."). In light of the foregoing, the Court concludes that even if it erred in excluding evidence of money paid by Defendant to Plaintiff while he was out of work, such error did not clearly affect Defendant's substantial rights, nor was such error so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice. *See, e.g., Farra*, 838 F. Supp. at 1026, *aff'd without op.*, 31 F.3d 1171 (3d Cir. 1994).

Lastly, Defendant argues that the Court erred in entering judgment in an amount that included, in addition to the jury verdict in the amount of $3,750,000.00, "the medical expenses expended by defendant on behalf of the plaintiff"—namely, $38,308.39. Having carefully considered the parties' submissions, it is clear that there has been some confusion surrounding this

issue. Defendant maintains, as a general matter, that the Judgment entered by this Court should not have added the $38,308.39 in medical expenses that were paid to Plaintiff by Defendant because Plaintiff suffered no out of pocket medical costs as a result of the incident in question; thus, to allow the Judgment to include this amount results in a windfall to the Plaintiff. Plaintiff, on the other hand, maintains that "the only reason the medical benefits have been added on to the verdict is because defendant insisted on asserting a claim of entitlement to them. If defendant drops its baseless assertion, then plaintiff is pleased not to pursue molding the verdict." (Pl. Opp'n Br. at 12).

Although Defendant raises a number of complicated and interrelated issues in its briefing on this issue—such as the implications of the collateral source rule, Defendant's indemnification under the FELA statute, and an Occupational Injury Report that was admittedly never signed by the Plaintiff—it appears that the issue is now moot given Defendant's concession—on reply—that Plaintiff is entitled to 100% of the medical expenses paid to him by PATH in connection with the incident in question. (Def. Reply at 10). In light of this concession, and based on Plaintiff's counsel's representation that the only reason the medical benefits have been added on to the verdict is because Defendant had indicated an entitlement to same, the Court grants this particular aspect of Defendant's motion and will amend its Judgment to deduct the $38,308.39 in medical expenses that were paid to Plaintiff by Defendant as a result of the incident in question. As such, the parties shall meet and confer and submit to the Court **on or before June 23, 2014** an agreed-upon proposed Amended Judgment for the Court's consideration.

## IV. CONCLUSION

For the reasons discussed above, Defendant's motion for a new trial, amended judgment and/or for remittitur pursuant to Federal Rule of Civil Procedure 59 [Docket Entry No. 47] is denied in part and granted in part. The parties shall submit to the Court **on or before June 23, 2014** an agreed-upon proposed Amended Judgment (that deducts the $38,308.309 in medical expenses that was previously added to the jury verdict) for the Court's consideration

An appropriate Order accompanies this Opinion.

s/ Jose L. Linares
JOSE L. LINARES
U.S. DISTRICT JUDGE

Date: June 11, 2014